The case for argument is United States v. Easley. Good morning and may it please the court. My name is Paige Messick. I'm an assistant United States attorney. I want to pull that microphone over to you. There you go. My name is Paige Messick. I'm an assistant United States attorney from the District of New Mexico. And I aspire to reserve some time for rebuttal. This encounter between Special Agent Jay Perry and Defendant Nicole Easley bears not one of the hallmarks of a seizure. There was no application of force, no intimidating movement, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice. In Drayton, the Supreme Court found it beyond question that an encounter lacking any of these features was consensual. And yet the District Court here, relying on four factors that were either insufficient or improper, concluded that Defendant had been seized and suppressed the evidence against her as a result. The District Court here first found, or among the factors, found that the Defendant, because she was a person of color, would be less likely to assert her rights and more likely to feel seized under a particular set of circumstances than would the prototypical reasonable person who the District Court understood to be modeled on a wealthy white male. But that approach doesn't square with the objective seizure analysis of the Fourth Amendment, which employs a test that by definition excludes a defendant's particular traits and characteristics and perceptions. That objective test asks, in this context, whether police conduct would have communicated to a reasonable person that they were not free to leave or terminate the encounter or decline the interaction. Was any other passenger taken from the bus? No other passenger was asked to step off the bus to speak to the agents, no. But the Supreme Court has held that asking a person to step aside to speak is the kind of classic consensual encounter. So I don't believe the fact that Easley was asked to step off the bus converts this consensual encounter into a seizure. We've had a lot of bus cases, so what is your best bus case that tells us what you've just said? I can't think of any bus case that this Court has faced that involves asking a person to step off the bus. I would point back to Florida v. Rodriguez, where agents asked a person at an airport to leave the area where they were to step aside to talk to them, and the Court found that factor did not convert the encounter into a seizure. But there you're in a public space in an airport aisle. I mean, you're not on the plane. You're milling around, and they take you aside and talk to you in a room. Here you're on the bus. Is that different? No, I don't think that it is different. And when Easley was on the bus, she was in a public place. When she was standing just off the bus in a busy bus station, she was still in a public place. Is it any different from taking someone out of a car? Well, here she was not commanded to leave the bus. Agent Perry asked if she would step off the bus so that they could talk further. And then he said, can we step over here to get away from this noise? Nothing in his tone of voice is commanding her to leave the bus. And I hope that if the Court hasn't listened to the recording yet, it does so, because there's nothing authoritative in the way that he was talking to her. He made sure that she knew that she wasn't being hauled off the bus with all of her stuff never to return. He told her that it was okay if she would leave some of her stuff behind. It's clearly communicating that she's not being arrested right here. Was her bus ticket taken from her and kept? No, at that time it wasn't. It was never taken from her and kept. Agent Perry did request to inspect it, but then he didn't. And that was after she was removed from the bus? Yes. After she left the bus, he did ask if he could see her ticket again, and then he examined it again and then returned it to her. And the district court found that he did so promptly, that there was no prolonged retention of her. And he returned it to her before he asked her, is that your luggage? Yes, he did. It had been returned by that point, certainly. And returning to the factor of race, the objective test calls for consistent application, regardless of the particular individual's impressions of the actions of the police. And accordingly, this court, en banc in the little case, disclaimed any across-the-board categorization of groups of travelers and rejected a rule that would hold, for instance, that all minorities are more vulnerable to coercion. And the Tenth Circuit and the Supreme Court have also both recognized that a person's attitude toward law enforcement shouldn't be relevant to the seizure question. For instance, in Yarbrough, the Supreme Court said that even if a particular defendant's history with law enforcement is known, the effect of that history on the person is not known and still speculative. And if that is true for an individual person whose history is known, then it's doubly true for a large group of people. And this court in Zapata, likewise, prohibited consideration of vaporous generalities regarding unverifiable and unquantifiable attitudes toward law enforcement. Beyond the constraints of precedent, the approach the district court adopted is unworkable. The Fourth Amendment objective test is designed to allow officers to know in advance if their conduct is violating the Fourth Amendment. And what the district court did here undermines that. The first officer under this test has got to determine the race of the person that they're dealing with, which sometimes may be straightforward, but in other cases may not be. And this is a test that an officer is going to have to employ in every case. And then from that, must determine what attitude toward law enforcement applies to a person of that particular perceived race. It is not clear how an officer can do that because people of color are not a homogenous group with a single attitude toward law enforcement. Some racial groups grant consent to search higher rates than others, which is not on this record. How uniform does that view have to be before it applies to the group as a whole? And what if there are differences between groups? What if there are differences in groups from different geographic regions, gender? There are a whole different set of factors that could affect a particular category of people's view towards law enforcement. And then even supposing that you could determine what view applies to this broad group, the officer is then tasked with assessing the impact of that attitude in the particular circumstances. So here, a crowded bus in the middle of the day, the officer has to ask whether that view toward law enforcement has any particular force in a situation like this, where there are other people around that may grant some comfort in that situation. And then the officer has got to determine what to do with that impression, and there's very little that Agent Perry could have done here to improve the consensual nature of the encounter on this bus. He treated everyone with respect. He didn't engage in any coercive conduct, and so he's left with no way to have a consensual encounter with Ms. Leasley solely because of her race. I'd like to touch quickly on the other factors that the district court relied on to determine that this encounter constituted a seizure. The district court looked first at the consent that other passengers on the bus had given and inferred that that meant that Agent Perry must have been doing something that was coercing these people into granting consent to speak to him and consent to search. I thought the theory there, the district court was pursuing that she felt, the defendant felt some pressure to be agreeable because everybody else had. Everybody else said sure, so how could she say no? That may have been one of the ways the district court was looking at that, but I don't think that that comports either with Drayton, which said that the fact that other people around, or I'm sorry, it may have been Bostic, the fact that other people are around actually gives a person some more comfort in saying no because they're inferred. Well, not if everybody else is saying yes. But the peer pressure kind of argument, while I understand that inference, it's not an inference that the reasonable person takes from the conduct of the officer. And the test phrase, the standard is whether the police conduct would convey to a reasonable person they are not free to terminate the encounter. And so even if you may want to cooperate with police because everybody else is and you don't want to stand out, that's not something that the police are doing to increase the coerciveness of the encounter. And in Drayton, the Supreme Court rejected a very similar inference that because other people were cooperating, this person would be coerced into doing so too. And the court said people cooperate for a number of reasons other than the coercion of law enforcement and the inference simply can't be drawn. Agent Perry is effective not because he is coercing the other passengers, but because he is so nice. And there's simply no reason to infer from the high rate of cooperation that other people are feeling coerced. And in fact, that inference lies in the face of Drayton. The district court also considered that Agent Perry made statements to other passengers about being on the bus for security purposes. And the district court considered these statements to be misleading. But in context, they are not misleading because Agent Perry, every time he asked for consent to search, asked, may I search for contraband? And so no one could have been misled into thinking he was not looking for contraband when he performed those searches. You also can't draw a clear line between searching for evidence of drug trafficking and security. Those two do have a relationship. So in context, these statements were not misleading. But even if you consider them to have been a form of a ruse implemented to increase cooperation with agents' requests, there was nothing coercive about those statements. He's not saying, hey, I think that there's a bomb on the bus. You've got to let me check this or else you're going to be in some sort of physical danger. There's no particular relationship between a person's feeling of freedom to decline a request when it's for contraband versus when it is for security versus when it is for illegal narcotics. So even if this is considered a ruse, there's nothing coercive about it. And then finally, the district court considered the lack of advisement of rights. This court has held that that factor should be entitled to limited weight. And the Supreme Court has said that it's not a requirement. It can't form a per se rule. And so without any other valid factors, there's nothing that can support the district court's conclusion of seizure. I'd like to reserve the rest of my time. Thank you. May it please the Court, Ms. Mezek. The district court was correct in its conclusion that based on the totality of the circumstances, DEA agents seized Ms. Easley without reasonable suspicion, rendering her alleged abandonment of the suitcase involuntary. Although the court relied on four specific factors and even though we cited more than ten in our brief, there is one overriding, undisputed factor which is sufficient by itself to sustain the district court's decision. When the clock struck 1115 a.m. on March 10th, 2016, and the eastbound bus did not depart the Albuquerque bus station because agents were pursuing their suspicious investigation, Ms. Easley and every other passenger on that bus was detained in violation of the Fourth Amendment. The district court relied appropriately. That would be one of the only first times that the Greyhound bus left on time. And, you know, it's not a problem if the government can point in the record, oh, the bus did not leave on time because of a problem with the bus. No, I mean if the bus driver was having a smoke or whatever. And I sure would have pointed that out if I was the government. It sure would have been important because when Ms. Easley took the stand and pointed out with documentary evidence that she sent a text at 1124 a.m. when the bus was scheduled at 1115 to depart and the bus had not departed and she's texting, he's questioning all of us. He's asking us to search our luggage. Other passengers are complaining, what the heck? Agent Perry stood in front of that bus as surely as that protester in Tiananmen Square stood in front of that tank. And the government throughout its brief goes on and on. He never blocked the exit. He never blocked the exit. He sure did. He didn't stand in front of the exit doors and say none may pass. But he prevented that bus from departing while he's saying to Ms. Easley, come here, over here, move here, leave that, take that. It's one thing to delay the departure of the bus for a suspicious investigation. But when you delay the departure of the bus and focus on one passenger, the only black passenger on that bus, when you subject that passenger to a level of questioning immediately. We don't know that she was the only black passenger. You know, I do, Judge Kelly, page 78 of the transcript, I asked Agent Perry, do you remember if there were any other black people on that bus? He says, I don't remember. Now, it may be that his I don't remember was, I don't remember there may have been, which he tried to explain later. But I read that and I think the district court appropriately found that he does not remember that there were any other black passengers on that bus. And that's page 78 of the transcript of the hearing testimony. And the other thing that is important to bear in mind, he would approach passengers and have two different levels of inquiry. He approached a passenger traveling from Bakersfield, California, to Oklahoma City, Oklahoma. And he asked him his four questions. Where are you going? May I search your luggage? And then he gets to Ms. Easley, where are you coming from? Where are you going to? How long are you going to be there? What's the purpose of your trip? Can I see your ID? Can I see your ticket? Can I have them? Can I hold them? Immediately, Ms. Easley, so far as the record reflects, the only black passenger on that bus. Two tickets had been purchased together. Yes, Judge Briscoe. And so wouldn't that give him some curiosity about her that others would not have? And the only way I can answer that question, Judge Briscoe, is it might have, but we don't know how many other passengers had two tickets purchased at the same time. We don't know whether mothers were traveling with their sons or uncles were traveling with their nieces. And yet we do know that when it came time to people with a Hispanic surname or the only black passenger on that bus, Agent Perry didn't have the same kind of questionings that he had for the gentleman traveling from Bakersfield to Oklahoma. And I think that's what's undermining the court's awareness and assessment of the totality of the circumstances in this case. So this defendant was seized when? Under the district court's analysis, this passenger was seized when she was ordered to get off the bus. And I think in terms of your review of this record, you can sustain the decision of the district court on any one of the 16 factors that we mentioned. But when you look at the undisputed evidence, that bus was supposed to depart at 1115. By 1124, he hadn't even asked Ms. Easley to get off the bus. And after he asked her to get off the bus, the only objective evidence in the record for why that bus did not leave was because that agent was pursuing his suspicion. Can you relate that factor, which you seem today to be saying is the most important factor to the issue, which is whether a reasonable person would have felt free to get off the bus or free to leave? And I think the court in Barrett, which we cited in our brief, said it best. An officer's instruction to delay the departure seized every passenger. Was there an instruction to delay the departure? What else explains the delay? Well, there's no evidence of that. With all due respect, I absolutely disagree. There is evidence that this, that the bus driver had collected all the tickets, that he was ready to go, and yet the bus did not depart. And there's only one reason from the record why the bus did not depart. And that's because Agent Perry had gone before the bus, the passengers re-boarded the bus, had gone into the luggage hold and observed. And I think the district court used the quote, observed the luggage. That is a concern that practitioners in our district have had for some time. In the Drayton case, was the timing a significant factor? Was there any discussion of how long the holdover was? No, because Drayton, as we pointed out in our brief, took place, as Judge Briscoe notes, in a public area before you're back on the bus, before we're all ready to go, someone comes up behind you and shows you a badge and says, can I ask you a question? That's not a seizure. You could reasonably, any reasonable person could say, you know, I'm really busy, I'm sorry. Can't do that. But, and again, the Leviton case, which we cited in our brief, the District of Columbia decision, a reasonable person can't feel free to walk away when she knows her means of getting home is to be held over until the officers are finished with their business. I don't think you can look at this record and draw any other conclusion that Ms. Easley's way home was impeded by the agent's actions, that everybody was ready to go. People are saying, what's the holdup, what's the holdup? No one is saying, oh, it's because we have a fuel pump problem, or it's because I need to get better directions. It's because an agent is saying, I need you to step off the bus. You can leave that, but you can take that. And then when she's off the bus, come over here. Put your things down there. Some people are picky about their stuff. So I'm just going to put your stuff right down here and hope that you're not picky about your stuff. That's why we have a totality of circumstances. And I think that the government's focus on race as a factor is a canard. The simple truth is race is a factor like a weight on a scale. We could take that factor out and still there's ample support for the district court's decision. But the district court properly and plainly recognized in this day and age, with names like Tamir Rice and Michael Brown and Eric Garner clogging our mind and our consciousness for a disparate level of treatment of people of color by law enforcement to suggest that race is not one small factor that the court may appropriately consider. As the court indicated in Mendenhall, I think it's an exercise in reducto ad absurdum. And I think it's blowing it out of proportion in a way that the district court relied on it as a totality of the circumstance because it's so obvious based on all of our experiences. Your Honor, if you've ever been subjected to a drug and addiction stop, you can understand the indignity of being singled out and being focused on and being moved about and to suggest that your way home is blocked by an agent. And that was free and voluntary, it's not correct. The district court was correct. I'd ask the court to affirm. Thank you.  My name is Afton Parris and I'm here on behalf of the National Association for Public Defense. I respectfully request that this court affirm the district court's decision below and find that the district court properly considered Ms. Easley's race in determining whether she could feel free to assert her constitutional rights and decline to consent to an encounter with Officer Perry. As the primary counsel has already addressed in this case, there are many factors that indicate why Ms. Easley was not able to assert her constitutional rights and decline to answer Officer Perry's questions. My assertion to this court is merely that race could be one of those factors. It could be properly considered by the district court and the district court properly did so here. Primary counsel mentioned that Ms. Easley was the only African-American passenger on this bus. She was subjected to a heightened level of questioning. Based on the Supreme Court's precedent in Mendenhall, her race and her reaction to that questioning could be part of the totality of the circumstances inquiry that the district court properly considered. The Supreme Court also recognized in Mendenhall that race is not an irrelevant factor. It is not necessarily dispositive, but it is not an irrelevant factor in the totality of the circumstances test that they established. Here, all of the circumstances indicate that Ms. Easley was not able to decline consent to the search by Officer Perry. Other passengers on the bus consented to a night... And she was not able to deny and was not able to not give consent, and the officer would have known that? How do we get to the objective test from her view of life as it is? Your Honor, the totality of the circumstances test inherently includes the factors that would implicate Ms. Easley's view of the world as she is encountering it in the context of this encounter with Officer Perry. But isn't that subjective and isn't that what Bostick tells us not to do? No, Your Honor. It's not subjective because the totality of the circumstances test looks to a reasonable person similarly situated. And in that inquiry, the district court should look at all of the factors that would influence whether someone is similarly situated, including their race. So who has the burden in this case? Does the government have the burden to show she consented or didn't consent? Or does the defense have the burden to say she was or was not seized? Your Honor, I believe that the defense has the burden to establish that her consent was invalid based on the arguments that were advanced by counsel at the trial court. Did the court conclude she was seized? Yes, Your Honor, the court did. And the court found that her consent to that particular search was coerced. It was not actually consensual. Did she abandon the suitcase that had the drugs in it? Your Honor, the district court also found that her abandonment of that suitcase was not consensual because of the totality of the circumstances that surrounded that search. Under the Mendenhall standard, all of the factors should be considered when the district court looks at each case that is presented before it. The district court has the discretion to walk that line and to determine whether based on these factors that are present in this case, a reasonable person who experienced the same factors, the same circumstances, and had the same view of the world, the lens through which they experienced an encounter with the police, would have been able to assert their constitutional right. Well, the district court didn't just... The factor the district court applied here, essentially she applied it to every case of every person of color when they're challenging whether a stop was consensual. I mean, she said, for the people of color are conditioned to presume that asserting their constitutional rights in a police encounter will increase their likelihood of physical harm or arrest. That would apply in every single case where we have an individual of color, wouldn't it? Yes, Your Honor. So, I mean, when you're talking about the totality of the circumstances in this case, she's saying, I'm going to categorically apply this approach based on race in every case. A person of color is making an argument about consent. What authority would we have to affirm that? Your Honor, I don't think this court needs to look any further than the Supreme Court's precedent in Mendenhall to establish that premise. The Supreme Court specifically said that race is not irrelevant in any totality of the circumstances inquiry. Although the district court should consider the factors that are before it and the circumstances that are before it in any inquiry, it's properly left to the district court to determine that race was a relevant factor. But that's different than saying, I'm going to categorically say that a person of color, I'm going to consider a person of color and the fact that they are presumed to act in a particular way. Because she's applying this in any case. And that's not what Mendenhall said. In fact, it's kind of the opposite of what you're saying.  Mendenhall says that all of the circumstances should be considered. When considering all of those circumstances, a person's age, a person's gender, a person's level of education. But that's consent. Mendenhall is a consent case. Yes, Your Honor. First we have to get through the door called seizure. Your Honor, I... So does the court have to, again, responding and following up on Judge Moritz's question, is this something that the court must always consider and we must always consider when looking at whether or not a person is seized? Whether they can exercise, I don't know, you keep flipping the burden there because the seizure goes to what the officer did. Your Honor, I see that my time has expired. Go ahead. May I briefly answer? Go ahead. Yes. Your Honor, in analyzing whether Ms. Easley was seized, the feeling of whether she was able to decline that encounter with the police is relevant. How would the officer know that? Based on considering the totality of the circumstances, Your Honor, the district court already has to consider those factors and the factors, the Mendenhall decision indicates to police officers that they also need to consider the totality of the circumstances. For all of those reasons, I respectfully request that this court affirm the district court's decision and find that race can be a relevant factor. Thank you. Briefly, Your Honors, I'd like to address the argument that even without the improper factors that the district court relied upon, that there's still enough to support the district court's conclusion. And I'd like to return to Drayton. This case is similar in a number of respects to Drayton. I will acknowledge, of course, that in Drayton, the defendant there was not asked to step off the bus to talk to the officers. But also in Drayton, we have the arrest of the defendant's companion right there. He's hauled off the bus. Then the officers continue to talk to the defendant in Drayton. And that was not held to convert the encounter into a seizure. So we don't have one particular factor in Drayton, or Drayton doesn't have one of the factors we have here. But those are, I would say, roughly equivalent in what they might convey to a reasonable person. In fact, I think when you consider that Agent Perry was talking to every single person on that bus and that he spent eight minutes talking to a previous passenger before he talked to defendant Easley, she would not have felt that being asked to step off the bus to continue the conversation was a particular aggressive focus on her, especially when you consider the tone, the polite and courteous tone that Agent Perry used throughout. So I don't think that this case can truly be distinguished from Drayton. But it was particularized at that point, which is a consideration. I'm sorry. It was highly particularized at that point on her. And she'd been told they're looking for contraband, and they pulled her off the bus and no one else. That is particularized. Well, I suppose it's always particularized when the officer is talking to you. But with regard to them looking for contraband, the reasonable person. He treated her differently than anyone else that he spoke to on the bus. That's particularized. Well, but he also spoke to another passenger for nearly three times as long. But he pulled her off the bus. He asked her to step off the bus. I apologize. No, but I mean, it would be different if he had said, you've got to get up and come with me right now. But he didn't. He asked permission, and she agreed to go with him. And asking to move to a different location has been held under the case law not to constitute a seizure. I see that my time has expired. Thank you.  Thank you, counsel.